**SO ORDERED.**

**SIGNED this 29 day of September, 2009.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re:<br>JOSEPH DEAN MURPHY a/k/a<br>JOE MURPHY and<br>AMANDA SUE MURPHY,<br><br>            Debtors. | Case No. 08-41222<br>Chapter 7 |
| EXCHANGE STATE BANK,<br><br>            Plaintiff,<br><br>v.<br><br>JOSEPH DEAN MURPHY a/k/a<br>JOE MURPHY,<br><br>            Defendant. | Adversary No. 08-7076 |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Exchange State Bank ("ESB"), seeks a judgment against Defendant, Joseph Dean Murphy ("Murphy"), in the amount of $165,150, plus interest, costs and attorney's fees. ESB also

seeks a determination that any such judgment is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2), (4) and (6).[1] The Court conducted a short trial, reviewed all admitted exhibits, evaluated the credibility of the witnesses, and is prepared to rule. This is a core proceeding over which this Court has jurisdiction to enter a final order.[2]

I.  **FINDINGS OF FACT**

Defendant, Murphy, began cattle ranching in southeastern Kansas in 1994. In 2002, Murphy entered into a verbal agreement with his grandfather, James Mitchell, and his neighbor, Larry Pyle. The agreement called for Mitchell and Pyle to each contribute $7,500[3] cash. Murphy did not invest any cash into the business, but instead managed the day to day operations. The business venture was named "2PM." Murphy's duties included selecting and purchasing the cattle for 2PM. He also provided direct labor and care for the animals, which included feeding and transporting them on pastures that he owned or leased. For a time, he also had the option of sending the animals to feedlots for care.

The parties agreed to divide all profits equally but did not address the split if the investment generated losses. No partnership documents or other contracts were ever drawn.

---

[1] This was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101 - 1532 (2005), unless otherwise specifically noted.

[2] 28 U.S.C. § 157(b)(1)(jurisdiction to hear core proceedings) and § 157(b)(2)(I)) (action to determine dischargeability of debt is core proceeding), 28 U.S.C. § 1334 and 11 U.S.C. § 523(c).

[3] Pyle testified at trial that he placed $15,000 into the business venture, which conflicted with Murphy's testimony that both Pyle and Mitchell infused $7,500. Because the actual amount of Pyle's investment is not critical to the outcome, the Court makes no finding of the amount Mitchell or Pyle invested.

On November 21, 2002, Murphy, Mitchell and Pyle, acting as principals of 2PM, engaged in a series of loan transactions with ESB in order to raise additional capital. They signed, in their individual names, two promissory notes. The first was for $75,018 and the second for $15,018. These notes established revolving credit lines that would fund 2PM's operations. In connection with signing the promissory notes, Murphy, Mitchell and Pyle granted ESB a security interest in all cattle purchased with the proceeds of the credit lines and signed an affidavit indicating that they "intend[ed] to sell the Collateral to, by or through only the following buyers, commission merchants or selling agents: Fort Scott Livestock Market, Inc."

Over the next four to five years, as the notes came due, 2PM would pay off the accrued interest and renew each of the credit lines. The names of the obligors on the notes changed periodically from 2PM to the individual owners names. The parties agree that the notes were secured by the prior security agreements entered into between the parties, as evidenced by the UCC Financing Statements placed on file with the Kansas Secretary of State. In connection with the renewal of each promissory note, Murphy, Pyle and Mitchell also signed new affidavits indicating where they intended to sell the cattle that collateralized the loans.[4]

In October 2004, 2PM requested an increase in its line of credit to expand the operation and take advantage of economies of scale. ESB agreed and extended another $75,000. On November

---

[4] The places where cattle could be sold changed from time to time. In at least one instance, the name "Tyson" was added to the Affidavit at some point after the Affidavit had been typed (as shown by the use of different typeface and font). The consistent, and credible, testimony on this issue was that the principals never understood that they could only sell cattle at the designated places. They believed that the Bank only needed a general idea of where the collateral would be sold. The Bank did not seem to take the execution or enforcement of these Affidavits very seriously until it was evident that the enterprise may fail. ESB was aware that Murphy was selling cattle at locations other than those stated in the Affidavit before it agreed to renew at least some of the notes.

3

2, 2006, the three notes were consolidated and renewed as one $165,000 note. Payment was due on the earlier of demand by ESB, or May 1, 2007. On May 4, 2007, 2PM agreed to pay additional interest of $7,284.77 and the bank granted a 90-day extension.

2PM did not make a payment prior to the extended deadline, so ESB sent a notice on August 14, 2007 demanding payment. Following this notice, Pyle and Mitchell collected and sold the remaining cattle from both the 2PM operation and from Murphy's "private" cattle inventory for approximately $20,000. The cash proceeds were paid to ESB and applied against the balance on the 2PM note.

During the preceding years, Murphy had been commingling his cattle with 2PM's and as a result, it is unknown what proportion of the approximately 40 head sold belonged to 2PM and what proportion belonged to Murphy. Murphy consented to the application of the proceeds to the 2PM note, and did not ask for a portion to be applied to his personal loans. ESB was fully aware that Murphy had commingled his cattle with 2PM's.

Murphy's accounting of the 2PM cattle operation was, at best, unsophisticated. In addition to the 2PM cattle and his own personal stock, Murphy also managed cattle for his grandfather, his in-laws, his brother, and for another individual named Kerry O'Brien. Only his in-laws and O'Brien's stock were kept separate, or at least identifiable, from the cattle owned by Murphy or his other family members. Murphy testified that the cattle he purchased with his in-laws were kept in a separate pen near his house. He would keep them there until he had sufficient numbers to take to a feedlot to be fed.[5] These cattle were never mixed with any of the other cattle kept by Murphy.

---

[5]His explanation for this arrangement was credible and logical. After the "mad cow" disease in December 2003, ESB instructed Murphy not to take pledged cattle to a feedlot, but to have Murphy pasture them to selling weight on his own or leased land. Ward feedlot had agreed

4

In the transactions with O'Brien, Murphy testified that he went to sale barns and purchased cattle. O'Brien would reimburse him by check after each purchase. Murphy then billed O'Brien for the cost of feed, veterinary bills, etc. Murphy identified O'Brien's cattle by ensuring that they were properly branded. Murphy testified there were probably six to seven loads of cattle purchased and sold in his dealings with O'Brien, with approximately 70 head of cattle per load.

Despite Murphy's ability to keep the cattle purchased with his in-laws and O'Brien separate, he was either unable or unwilling to manage cattle purchased by 2PM and his own cattle operation in a similar fashion. Murphy testified that they developed a brand for 2PM, but that he stopped using it when the operation ran into financial trouble and he realized he was short on sufficient cattle to secure 2PM's and his personal loans to ESB. Murphy also testified that he used ear tags for a while to keep a proper accounting of the cattle, but that he abandoned that practice as well. Murphy admitted that he intentionally stopped all attempts to identify and separate the 2PM cattle from his own in order to save time and the costs associated with tagging and branding.

In addition to commingling the 2PM cattle with his own stock, Murphy funneled the income from the various operations through his personal checking account at ESB. Murphy used this account to make deposits and write checks for both his business activities and his personal affairs, even though 2PM had an account at ESB. The 2PM account was apparently used initially, but was closed in 2005.

---

to finance the purchase of some cattle, but ESB refused because this arrangement would have required that it take a second lien on the cattle. Accordingly, Murphy established a separate arrangement with his in-laws. Murphy did not take advantage of this opportunity to harm the bank and complied with ESB's request that he not handle "its" collateral in this fashion. Murphy believed that he could make some extra income by having a small cattle operation with his in-laws, who allowed him to take advantage of the Ward financing option.

5

Case 08-07076   Doc# 37   Filed 09/29/09   Page 5 of 19

The commingling of his personal and the 2PM cattle was not as troublesome as his handling and disposition of the pledged cattle. After the mad cow disease started in December 2003, and a sharp increase in the price of feed corn from $1.50/bushel to $7-$8/bushel, Murphy and 2PM struggled to remain solvent. Eventually, Murphy was forced to sell cattle to pay operating expenses, resulting in fewer cattle to secure the ESB loans. Murphy testified that because of the commingling, by 2005 or 2006, he was no longer able to differentiate between his and 2PM's stock.

The evidence at trial established that prior to the renewal of each note, which occurred approximately every 6 months, ESB's Executive Vice President Dean Davied personally accompanied Murphy to inspect the cattle. ESB wanted to insure that sufficient cattle existed to fully secure its loans to 2PM and Murphy. Murphy and Davied never executed a physical count of the cattle nor did they actually weigh them; instead they relied on estimates made by visual inspection of quantity and weight in each pasture.

ESB had knowledge that Murphy was commingling his cattle with 2PM's. The evidence at trial established that Murphy and Davied, after making the quantity and weight estimates, would apportion the entire inventory between Murphy's personal stock (also security on Murphy's personal loans with ESB) and 2PM's stock. As long as the total number of cattle appeared to be sufficient to keep the bank fully secured on both Murphy and 2PM's notes, ESB did not require Murphy to change his methods of accounting for the cattle.[6] Despite the deficient accounting and the informal apportionment methods, ESB routinely renewed the notes upon receipt of the interest payments.

---

[6]It also appeared that ESB may have been more relaxed about the adequacy of the collateral because both Mitchell and Pyle had unencumbered assets that appeared to be sufficient to further secure repayment of the note.

6

Murphy testified that he understood that cattle purchased with proceeds from the 2PM loans served as collateral to ESB. Despite this knowledge, Murphy sold 2PM cattle and used at least a portion of the funds for his personal use and to pay expenses related to his personal cattle operation. Although it is unclear exactly when the 2PM cattle were sold and the cash proceeds misapplied, it is clear that by October 2006, the number of cattle collateralizing the $165,000 note to ESB had dwindled significantly.

On October 23, 2006, Davied and Murphy conducted an inspection of the cattle collateralizing both Murphy's personal and 2PM's loans. Murphy testified at trial that he knew at that time that there was not enough cattle to fully secure the loans. In an effort to hide that fact, he told Davied that he was in possession of one hundred cows when he admits there were only sixty present. Pyle corroborated this testimony by testifying that at some point between May and September 2007, he had a meeting with Murphy where Murphy admitted that he had misrepresented the cattle quantities to Davied during the October 23rd inspection. He further admitted that the number of cattle had dwindled even below what he had told Davied. Murphy knew from prior inspections how many cattle were necessary for ESB to renew the notes.

Davied testified that if he had known the truth, he would not have agreed to renew 2PM's note on November 2, 2006. The report created by Davied following the inspection shows that based on Murphy's statements and his own inspection, Davied believed there were nearly 300 head of 2PM cattle, with a total value of just over $166,000, enough to fully secure its $165,000 loan. When the cattle were rounded up and sold on September 1, 2007, there were only 40 head of cattle, which included both 2PM cattle and Murphy's personal stock. Part of the reason for the deficiency is Murphy continued to sell cattle even after the last extension, and after the note was finally called.

7

None of the cash proceeds from those sales were applied to the past due note, and it appeared that he had no alternate plan for payment.

Additional facts will be discussed below, when necessary.

## II. ANALYSIS

Plaintiff alleges that its debt should not be discharged pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6). The Court will address each of these claims separately. Before doing so, it is important to note that the purpose of bankruptcy is to allow a debtor to have a financial "fresh start." However, the Bankruptcy Code does not provide a blanket fresh start for all debtors under all circumstances. In fact, § 523 provides an express list of debts that are nondischargeable in a Chapter 7 bankruptcy. Section 523 balances the competing policies of allowing a fresh start while preventing a debtor from prospering from his own bad acts.[7]

### A. Standard of Review

The burden of proof rests with the party opposing the discharge. Accordingly, ESB has the burden of proof, and must meet that burden by a preponderance of the evidence.[8] Discharge provisions are strictly construed against the creditor and, because of the fresh start objectives of bankruptcy, doubt is to be resolved in the favor of debtors.[9]

### B. ESB met its burden of showing that the debt is non-dischargeable pursuant to § 523(a)(2)(A).

---

[7]*Field v. Mans*, 157 F.3d 35, 44 (1st Cir. 1998).

[8]*See Grogan v. Garner,* 498 U.S. 279, 291 (1991) (holding that preponderance of the evidence standard, not clear and convincing standard, applies to all exceptions to discharge). *See also In re Busch*, 369 B.R. 614, 623 (10th Cir. BAP 2007).

[9]*In re Sweeney*, 341 B.R. 35, 40 (10th Cir. BAP 2006) (citing *In re Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997)).

8

Section 523(a)(2)(A) of the Bankruptcy Code provides an exception to discharge "for money, property, services, or an extension, renewal, or refinancing of credit" if a debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." ESB must prove, by a preponderance of the evidence, (1) that Debtor made a false representation; (2) that the representation was made with intent to deceive ESB; (3) that ESB justifiably relied on this representation, and (4) that ESB sustained a loss as a result of the false representation.[10] A debtor's intent to deceive a creditor in making false representations, within the meaning of the fraud discharge exception, may be inferred from the totality of circumstances, or from a knowingly made false statement.[11]

Intent to deceive may also be demonstrated by a defendant's reckless disregard for the truth or accuracy of his representations.[12] "The Court is mindful, however, that reckless disregard for the truth or accuracy of the representations as a basis for satisfying the intent requirement under 11 U.S.C. § 523(a)(2)(A) should be construed narrowly."[13] There must be some indication as a whole that "'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the

---

[10]*Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[11]*Id.* at 1375.

[12]*In re Daviscourt,* 353 B.R. 674, 685 (10th Cir. BAP 2006) ("Intent to deceive under this subsection [§ 523(a)(2)(A) ] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth."); *In re McGuire*, 284 B.R. 481, 493 (Bankr. D. Colo. 2002) (noting that "the Tenth Circuit has held that a finding of reckless disregard may satisfy the scienter element" under § 523(a)(2)).

[13]*FTC v. Abeyta (In re Abeyta)*, 387 B.R. 846 (Bankr. D.N.M. 2008) (citing *In re McGuire*, 284 B.R. 481, 854, 493 (Bankr. D. Colo. 2002)).

9

creditor.'"[14] A debtor's silence regarding a material fact can constitute a false representation under § 523(a)(2)(A).[15]

Courts typically look for specific indicia of fraud, often referred to as "badges of fraud," when analyzing a case under § 523(a)(2)(A).[16] However, when a court analyzes a case by evaluating the badges of fraud, the Court must be mindful that the cases are peculiarly fact specific, and the conduct in each case must be viewed individually, which this Court has done.[17]

ESB claims several acts by Murphy constitute fraud sufficient to have his debt to the bank found nondischargeable. First, ESB claims that Murphy acted fraudulently by commingling his personal cattle with those belonging to 2PM. The Court finds that because Murphy did this with the implied, if not express, permission of ESB, that this allegation does not provide a basis for a finding of non-dischargeability. To prevail on a fraud claim, ESB must show that it justifiably relied upon Murphy's actions to its own detriment. That element is lacking here; the record clearly reflects that ESB had knowledge of this practice, as shown by the unrebutted evidence that Davied and Murphy

---

[14]*Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000) *aff'd in part and vacated in part by* 35 Fed. Appx. 826 (10th Cir. 2002) (quoting 3 William L. Norton, Jr. Norton Bankruptcy Law and Practice 2d § 47:16, n.62 (1999) (citations omitted)).

[15]4 Collier on Bankruptcy ¶ 523.08[1][d] (15th ed. rev. 2008).

[16]Actions from which fraudulent intent has been inferred include situations in which a debtor conceals pre-bankruptcy conversions, converts assets immediately before the filing of the bankruptcy petition, gratuitously transfers property, continues to use transferred property, and transfers property to family members. Courts also consider the monetary value of the assets converted, whether the debtor obtained credit in order to purchase exempt property, whether the conversion occurred after entry of a large judgment against the debtor, whether the debtor had engaged in a pattern of sharp dealing prior to bankruptcy, and whether the conversion rendered the debtor insolvent. *Cadle Company v. Stewart (In re Stewart*, 263 B.R. 608, 611 (10th Cir. BAP 2001)).

[17]*Id.*

10

performed numerous cattle inspections on these commingled cattle, and would then sit down and apportion those cattle between Murphy's personal loans and those of the 2PM operation.

Second, ESB claims that Murphy committed fraud by selling 2PM cattle at sale barns that were not authorized by the affidavits signed in conjunction with the renewal of the 2PM notes. As noted above, in order to constitute fraud, Murphy's actions must have been done with the intent to deceive the bank. Both Murphy and Pyle testified they did not read those affidavits closely, that it was never their understanding that the businesses listed on those forms were the only places where 2PM cattle could be sold, and Murphy testified that regardless where the cattle were sold, he put the sale proceeds into the general account. It was clear from the evidence at trial that the intent to defraud is missing as to this claim. In addition, it was clear that ESB knew or should have known that Murphy was selling cattle at places other than those listed on the Affidavits, but chose to renew the notes several times after it had this information.

However, the Court does find that Murphy's actions at the October 23, 2006 cattle inspection provide sufficient grounds to sustain a fraud claim under § 523(a)(2)(A). Debtor essentially admitted at trial that he intentionally misled ESB about the number of cattle present at the time of that inspection. Murphy testified that he did so because he knew that the number of 2PM cattle to secure the note was substantially short, and he was afraid ESB would call the note if they knew the true status of their collateral. He was confident he could turn things around, so he did not think this misrepresentation was serious. Murphy's testimony was corroborated by Pyle, who testified that Murphy admitted the misrepresentation he made to Davied at a private meeting they had after the inspection.

11

Furthermore, the bank officer in charge of handling the 2PM loans testified that he would not have agreed to renew the notes had he known that there were significantly fewer cattle than were represented by Murphy. The Court was initially troubled by the fact that the Bank officer accompanying Murphy at the October 2006 inspection apparently decided to rely on the numbers provided by Murphy instead of performing his own physical count. In other words, the Court had some concern about whether ESB's reliance on Murphy's admitted misrepresentation was justified. But testimony indicated the cattle grazed on up to 300 acres in approximately four pastures, and that cattle "hide" in trees and "move." Murphy was feeding and caring for the animals on a daily basis, as well as purchasing and selling them. The bank had a right to rely on the numbers that Murphy represented, and the Court finds it did so.

Accordingly, the Court finds that Murphy's misrepresentation caused harm to ESB by effectively persuading it not to call the note or notes when they came due on October 31, 2006. Instead, ESB renewed the line of credit for an additional six months, during which time the number of 2PM cattle continued to dwindle to the point where the loan was substantially under secured.

Having met all of the elements of a cause of action under § 523(a)(2)(A), the Court finds that judgment should be granted in favor of ESB on its claim against Murphy. Based upon Murphy's false representation at the collateral inspection on October 23, 2006, which induced ESB to renew the loan, the debt owed by Murphy to ESB is found to be nondischargeable.

**B.  ESB failed to show that the debt is non-dischargeable under § 523(a)(4).**

Section 523(a)(4) provides an exception to discharge from any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To prevail under this provision of

12

§ 523(a)(4), ESB must first prove that a fiduciary relationship existed between itself and Murphy.[18] It must then prove that Debtor committed fraud or defalcation within the course of that fiduciary relationship.[19] In *Fowler Brothers v. Young (In re Young)*,[20] the Tenth Circuit discussed breach of fiduciary duty as it relates to § 523(a)(4), as follows:

> The existence of a fiduciary relationship under § 523(a)(4) is determined under federal law. However, state law is relevant to this inquiry. Under this circuit's federal bankruptcy case law, to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the Debtor. Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4). Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability. Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy.[21]

ESB contends that the structure of the 2PM cattle operation is that of a partnership under Kansas law, and that the Kansas Uniform Partnership Act[22] creates a fiduciary duty between Murphy and his alleged partners, Pyle and Mitchell. ESB then argues that § 523(a)(4) "does not seem to require that the fiduciary relationship exist between [Murphy] and [ESB] in this case, but only that it exists and that the defalcation occurred while [Murphy] was acting in a fiduciary capacity."

---

[18] *Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997) (citing *Fowler Bros. v. Young*, 91 F.3d at 1371).

[19] *Id.*

[20] 91 F.3d at 1371-72.

[21] *Id.*

[22] K.S.A. 56-101.

13

The Court generally agrees with ESB's contention that 2PM was likely acting as a partnership and that Murphy may well have owed a fiduciary duty to Mitchell and Pyle.[23] However, the duty owed to his "partners" does not pass through to ESB. Although § 523(a)(4) does not specifically state that the fiduciary duty must exist between a debtor and the objecting creditor, binding caselaw in this Circuit clearly does.[24]

There was no evidence presented, or argument made, that Murphy owed a fiduciary duty to ESB. At most, ESB could argue that borrowing funds from ESB created a fiduciary duty for Murphy to account for the collateral to his partners. However, as explained in *In re Young*, "the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy."[25] Because ESB wholly failed to establish that a fiduciary relationship existed between itself and Murphy prior to the creation of the debt, ESB's claim under § 523(a)(4) is denied.

### C. ESB failed to show that the debt was dischargeable under § 523(a)(6).

Plaintiff's final claim is that Debtor caused a willful and malicious injury to it, and as a result, the debt he owes ESB should not be dischargeable pursuant to § 523(a)(6). Section 523(a)(6) provides an exception to discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity."

---

[23] Because the form of this venture is not dispositive to the issues before the Court, it does not decide whether there was, in fact, a partnership under Kansas law.

[24] *See Storie*, 216 B.R. at 286.

[25] *In re Young*, 91 F.3d at 1372.

14

In 1998, the Supreme Court clarified, in *Kawaauhau v. Geiger*,[26] that § 523(a)(6) only applies to a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. In other words, debts arising from injuries that are recklessly or negligently inflicted are not within the exception of § 523(a)(6). The Supreme Court explained that a debtor must have intended the consequences of his act, not simply the act itself.[27]

That said, if a debtor actually knows, or should reasonably foresee, that his voluntary conduct will result in injury, the conduct is deemed willful and malicious.[28] And as noted by the Court of Appeals for the Tenth Circuit, without proof of *both* a willful act and a malicious injury, an objection to discharge under § 523(a)(6) must fail.[29] A wrongful act done intentionally, which necessarily produces harm or that has a substantial certainty of causing harm, and is without just cause or excuse, is "willful and malicious" within the meaning of § 523(a)(6).[30]

---

[26] 523 U.S. 57, 60-64 (1998).

[27] *Id.* at 61-62. *See also Horn v. Hazard (In re Hazard)*, 166 B.R. 145, 147 (Bankr. E.D. Mo. 1994) (citing W. Prosser, Law of Torts 32 (4th ed. 1971) (stating "a person should be deemed to have intended a result when 'a reasonable person in ... [his] position would believe ... [such a] result was substantially certain to follow.'")

[28] *Davis v. Williams (In re Williams)*, 173 B.R. 912 (Bankr. W.D. Ark. 1994); 4 Collier on Bankruptcy ¶ 523.12[2], p. 523-94 (15th ed. rev. 2009).

[29] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) (emphasis in original).

[30] 4 Collier at ¶ 523.12[2] (noting that liability arising from assault or battery is generally considered as founded upon a willful and malicious injury and is therefore within the exception); *Hixson v. Hixson (In re Hixson)*, 252 B.R. 195, 198 (Bankr. E.D. Okla. 2000) (noting that debts arising from assault and battery, absent legal justification or excuse, are considered willful injuries under § 523(a)(6)).

Generally, causes of action for breach of contract do not give rise to a nondischargeability claim under § 523(a)(6). However, transfers in breach of a security agreement may render a debt nondischargeable when the debtor's conduct is knowing and certain to cause financial harm.[31] "Unless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew the transfer of the property was wrongful <u>and certain to cause financial harm to the creditor</u>, the debt should not be found nondischargeable."[32]

Applying the settled legal standard to this case, the Court finds that ESB failed to show that Murphy acted willfully and maliciously in causing damage to ESB's property. The evidence clearly established that Murphy was commingling the cattle that secured ESB's loan to 2PM with cattle that secured ESB's loan to Murphy, as well as commingling the proceeds from the sale of both categories of cattle. The evidence also established that Murphy sold cattle that secured ESB's loan without applying the cash proceeds to the 2PM note and misled ESB's bank officer into believing that sufficient cattle existed to collateralize the notes. These acts were clearly willful, as there is no evidence that Murphy's actions were inadvertent or accidental. Murphy clearly knew what he was doing in operating the cattle operation in this manner.

However, the Court finds that there was insufficient evidence to show that Murphy acted in a malicious manner toward ESB. It is clear that Murphy operated under a sense of eternal optimism that things would soon turn around—a rather common occurrence with farmers and ranchers. The Court was impressed with Murphy's work ethic, and came away with little doubt that Murphy intended to continue working hard to turn things around, make a profit, and repay the loan. It was

---

[31] 4 *Colliers on Bankruptcy* § 523.12[1] (15th ed. rev. 2001).

[32] *Id* (emphasis added).

16

never his intent to defraud ESB or maliciously cause any injury to the bank. He always thought that, given more time, and a more favorable cattle market, that he would be able to pay back the loan.

Furthermore, there was absolutely no evidence that Murphy was selling ESB's cattle to fund an extravagant lifestyle or make frivolous or extravagant purchases. He commingled cattle money, but all of the money went right back into the only account he kept—at ESB—and he was not trying to hide anything from anyone about how he was conducting this business. ESB was fully aware that Murphy was conducting business in this fashion—and had been doing so since at least 2005. ESB never suggested to him that his business practices were improper. In fact, with substantial knowledge of his business practices, it continued to renew the loan many times.

The Court finds that because of the economic climate, including the financial set back to the beef industry precipitated by the mad cow disease from which 2PM never recovered, coupled with increasing feed prices, Murphy got behind on cattle early on and just kept plugging away, trying to find ways to make this venture profitable. He tried different ways of conducting the cattle operation, including a venture he ultimately conducted with his in-laws using the financing available through a specific feed yard that ESB refused to let him use for its collateral. He worked a second job, in the evening, while trying to hold on and earn a profit. His grandfather was jointly responsible for this debt, and it was clear that he tried everything he could to spare his grandfather from losing his money. At trial, it was clear that Murphy did everything he knew how (including the misrepresentation noted above) to try and keep this cattle venture afloat.

Obviously his efforts failed, but there was no evidence of a malicious intent behind any of his actions. There was no evidence presented to show that Murphy acted in a manner that he knew

17

was certain to cause financial harm to ESB. Having failed to establish that Murphy acted with a malicious intent to cause injury to ESB, the claim under § 523(a)(6) fails.

        **D.     ESB is entitled to judgment on its claim, but not in the amount prayed for in the Pretrial Order.**

ESB has shown that Murphy owes a debt to it because Murphy failed to fulfill his obligations under the promissory note and the Commercial Extension Agreement, and that the debt is nondischargeable. In the Pretrial Order, ESB requested judgment against Murphy in the amount of "$165,150 plus interest, costs, and attorney's fees . . . ." Murphy does not appear to contest his liability on this note, only its dischargeability.

The only evidence received demonstrates that the balance due on the note as of January 6, 2008 was $154,295.56.[33] This amount allows for the accrual of interest through that date, and also credits the $20,889.61 payment made on the note following the sale of the remaining cattle by Pyle and Mitchell.

The Court finds that judgment should be granted in the amount of $154,295.56, plus interest at the contract rate of 9.25% from January 6, 2008 through the date of this judgment. ESB is also entitled to post-judgment interest at the statutory rate set forth in 28 U.S.C. § 1961, from the date of judgment until the debt is paid in full. Further, as the prevailing party, ESB is entitled to its costs in connection with this action.

Neither party addressed the issue of attorney fees at trial, or in the post-trial briefing. Accordingly, the Court will not rule on the issue of attorney fees at this time. Instead, the Court will schedule a telephone conference with counsel to determine the parties' respective positions on this

---

[33]Exhibit 51.

remaining issue prior to entry of final judgment.  Counsel are expected to be prepared to discuss the authority on the issue of whether ESB is entitled to its reasonable attorney fees.

## III.  CONCLUSION

The Court finds that ESB is entitled to judgment in the amount of $154,295.56, plus interest based upon Murphy's failure to repay the note.  The Court further finds that the debt was procured by fraud based upon Murphy's misrepesentation of the number of cows in his possession during the inspection conducted October 23, 2006.  Because this misrepresentation induced ESB to renew the note, it is nondischargeable pursuant to § 523(a)(2)(A).  The Court denies relief under § 523(a)(4) and § 523(a)(6).

**IT IS, THEREFORE, BY THE COURT ORDERED** that a nondischargeable judgment will be entered in favor of Plaintiff, Exchange State Bank, and against Defendant, Joseph Dean Murphy, in the amount of $154,295.56, plus interest at the contract rate of 9.25% from January 6, 2008 through the date of judgment, and post-judgment interest at the statutory rate from the date of judgment until the debt is paid in full.  The Court will reserve ruling on Plaintiff's request for attorney fees pending further hearing.

**IT IS SO ORDERED**.

###

19

Case 08-07076    Doc# 37    Filed 09/29/09    Page 19 of 19