


**SO ORDERED.**

**SIGNED this 10 day of November, 2009.**

JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **In re:**<br>**JOSEPH DEAN MURPHY a/k/a**<br>**JOE MURPHY and**<br>**AMANDA SUE MURPHY,**<br><br>**Debtors.** | **Case No. 08-41222**<br>**Chapter 7** |
| **EXCHANGE STATE BANK,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JOSEPH DEAN MURPHY a/k/a**<br>**JOE MURPHY,**<br><br>**Defendant.** | **Adversary No. 08-7076** |

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION FOR RECONSIDERATION**
**AND ENTERING JUDGMENT FOR DEFENDANT**

This matter is before the Court on Defendant, Joseph Dean Murphy 's ("Murphy") Motion for Reconsideration.[1] Murphy contends that the Court made errors in its factual findings in ruling that Murphy's debt to Plaintiff Exchange State Bank ("ESB") was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). This is a core proceeding over which this Court has jurisdiction to enter a final order.[2]

## I. BACKGROUND

ESB initiated this adversary proceeding seeking to exclude from Murphy's discharge a debt incurred by Murphy in connection with a cattle operation. The cattle operation, named 2PM, was a joint venture between the three owners: Murphy, his grandfather, Jim Mitchell, and his neighbor, Larry Pyle. The operation bought cattle, fed them in various pastures owned or rented by Murphy (and on occasion sent them to a feedlot), then sold them, hoping for a profit. The operation was funded by an ESB line of credit that was secured by the cattle owned by 2PM; the note to ESB was signed by all three owners of 2PM. The operation ended in the fall of 2007, when ESB called the note after it became obvious that there were insufficient cattle to collateralize the note. The remaining 40 head,[3] which included all the cattle owned both by 2PM and Murphy, himself, were ultimately sold and the proceeds applied to the ESB line of credit owed by 2PM. The proceeds paid only a fraction of the $165,000 owed to ESB.

---

[1]Doc. 41.

[2] 28 U.S.C. § 157(b)(1)(jurisdiction to hear core proceedings) and § 157(b)(2)(I)) (action to determine dischargeability of debt is core proceeding), 28 U.S.C. § 1334 and 11 U.S.C. § 523(c).

[3]There was conflicting testimony whether there were approximately 40 or 70 head remaining to be sold at the time the cattle operation finally wound down. The difference is immaterial to the final outcome of the case.

The Court conducted a trial on September 3, 2009, and issued its written decision September 23, 2009.[4] The Court found that ESB had failed to carry its burden to prove that the debt was nondischargeable under §§ 523(a)(4)and (a)(6), but that ESB had met its burden of showing that Debtor had, by fraud, obtained the renewal of the 2PM note. The Court entered judgment for ESB, finding the debt nondischargeable under § 523(a)(2)(A).

Murphy contends the Court erred in finding that (1) Murphy misled ESB as to the number of cattle he had in his possession at a livestock inspection on October 23, 2006; (2) Murphy had continued to sell cattle following the last extension of the note and after the note had been called; and (3) Murphy never used any of the proceeds from the sale of the cattle to pay toward the note with ESB.

## II. STANDARDS FOR ANALYZING A MOTION TO RECONSIDER

Rule 9023 of the Federal Rules of Bankruptcy Procedure incorporates Rule 59 of the Federal Rules of Civil Procedure, and allows for alteration or amendment of judgments on the grounds for relief set forth in Rule 60(b) of the Federal Rules of Civil Procedure, as incorporated in Bankruptcy Rule 9024.[5] Grounds for relief include mistake, inadvertence, surprise, excusable neglect, fraud or newly discovered evidence. A motion to reconsider that is filed within ten days of the entry of judgment, as was this one, is treated as a motion to alter or amend.[6]

The legal standard for granting a motion for reconsideration is narrow. "A motion for reconsideration should be granted only to correct manifest errors of law or to present newly

[4]Doc. 36.

[5]*See In re Colley,* 814 F.2d 1008, 1010 (5th Cir. 1987).

[6]*In re American Freight System, Inc.*, 168 B.R. 245, 246 (D. Kan. 1994).

discovered evidence."[7] "Such motions are not appropriate if the movant only wants the Court to revisit issues already addressed or to hear new arguments or supporting facts that could have been presented originally."[8]

## III. DISCUSSION

The Court based its holding that Murphy's debt to ESB was nondischargeable on its understanding that Murphy had misled ESB about the number of cattle under Murphy's control at the time of the October 23, 2006 cattle inspection.[9] The Court based this finding in part on the testimony of Larry Pyle, Murphy's neighbor and business associate in the cattle operation, that Murphy admitted he had overstated, by 40 head, the number of cattle that were available to secure the 2PM note in a conversation Murphy had with ESB banker Davied. Debtor admitted he met with Pyle at Bone Creek Lake to discuss 2PM's status, but could not recall exactly what he said to Pyle. Pyle testified that Murphy told him that he had overstated the number of cattle securing the 2PM loan, claiming there were 100 head when there were really only 60.

Following the filing of the motion for reconsideration, the Court has carefully reviewed the entire testimony given in this case, as well as the relevant exhibits that relate to this alleged misrepresentation. The memories—and therefore the testimony, of the witnesses was fairly unclear about the timing of this alleged misrepresentation, or whether it took place at all. In fact, the

---

[7] *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, n.5 (10th Cir. 2000) (internal quotations omitted).

[8] *Zhou v. Pittsburg State Univ.*, 252 F. Supp. 2d 1194, 1199 (D. Kan. 2003) (citing *Van Skiver v. U.S.*, 952 F.2d 1241, 1243 (10th Cir. 1991).

[9] Because this holding formed the basis for the Court's finding of nondischargeability, it will not address the other two alleged errors.

testimony among the small handful of witnesses was only consistent to the extent it was consistently vague as to key details.[10]

Pyle's testimony about this issue centered on his conversation with Murphy at Bone Creek Lake. Following the receipt of evidence, closing argument and post-trial briefs, the Court was left with the overall impression that the conversation between Murphy and Davied regarding the number of available cattle to secure ESB's 2PM loan had likely taken place in connection with the inspection conducted October 23, 2006. That inspection led to the renewal of the note, in November 2006, for another six month term.

Based upon a closer review of the pertinent testimony, combined with another review of the exhibits received, however, the Court agrees that it made an error of fact about the time when this critical conversation occurred. The Court finds it more likely than not that the misrepresentation occurred in conjunction with, or even after, the May 4, 2007 extension of the maturity date on the note, rather than the November 2006 renewal of the note. As will be explained, the timing of this misrepresentation is dispositive, and requires the Court to reverse its prior decision.

The evidence clearly established that Davied performed a cattle inspection with Murphy on October 23, 2006.[11] Although it is unknown the precise number of 2PM cattle present that day, Davied and Murphy jointly estimated that there were approximately 293 head available to secure the

[10] The Court does not believe that any of the witnesses in this case were intentionally vague in their testimony. Instead, the lack of detail in the testimony is almost certainly due to the passage of time, and the fact that many of the meetings and conversations that took place in this case were done in an informal setting, leaving no document trail to help refresh memories as to specific times and locations.

[11] At trial, Murphy was at first confused about what inspection was skipped due to his obtaining the coop job. Murphy ultimately remembered the sequence of events after cross-examination, and review of the trial exhibits over the lunch break on the date of trial. His testimony on this was credible, especially in light of the fact that the events in question had occurred more than two years earlier. He also testified that when he called Davied to request the extension of the inspection on or about May 2007 that he told Davied that he was "short" on cattle, and that the banker agreed to extend the note for 90 days notwithstanding that testimony.

2PM note. There were additional cattle that secured Murphy's personal debt to ESB, and Davied and Murphy jointly inspected for both "sets" of cattle.

Upon further reflection, the Court now finds it extremely unlikely that Murphy's misrepresentation that there were 100 head to secure the 2PM loan, when there were actually only 60, occurred at that October 23 inspection. Although the Court understands that estimating the number of cattle during a pasture-by-pasture inspection is an inexact science, it would have been unreasonable for the banker to view only 60 cattle located in four or more different pastures and believe that there were actually almost five times (293) that many present, or more.[12] The Court believes, and finds, that the misrepresentation did not occur in connection with the October 23, 2006 inspection.

Instead, the Court finds that it is much more likely that the conversation between Murphy and Davied occurred at a time when no physical cattle inspection occurred, i.e., when Davied did not see with his own eyes the number of cattle in the various pastures. It is also more likely that the conversation occurred towards the end of the cattle operation, since the number was much closer to the number that existed when the loan was actually called, when the final August 2007 inspection was actually conducted, and when the remaining collateral was ultimately sold. In addition, Pyle testified that this conversation with Murphy, where he admits having underestimated the number of

---

[12]Because the cattle were co-mingled, which ESB well knew, there were actually considerably more than 293 head in the pastures Davied and Murphy visited on October 23. The 293 figure only represents those that were needed to secure the 2PM loan. So the difference would have been even more apparent upon inspection than the 293 vs. 60 head scenario.

head by 40 when talking to Davied, was after the May 2007 extension date but before the September 2007 sale of the cattle.[13]

Although it does appear that Murphy did misrepresent the cattle numbers to Davied, the fact that this misrepresentation took place either in connection with the May 4, 2007 extension of the note, or likely later, is critical to the Court's analysis. "In order to establish a non-dischargeable claim under [§ 523(a)(2)(A)], a creditor must prove the following elements by a preponderance of the evidence: 'The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was reasonable; and the debtor's representation caused the creditor to sustain a loss.'"[14] Furthermore, although the fourth element of a non-dischargeability claim is that a creditor's reliance must be reasonable, the Tenth Circuit has explained that "the appropriate standard is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint."[15]

ESB met its burden as to the first element. Based upon the testimony of Pyle, Murphy made the false representation (underestimating the number of collateral by 40 head), and he did so to buy himself time to figure out some way to pay back the loan. But the Court finds that ESB failed to

---

[13]See transcript at approximately 1:00 pm. Pyle would have a financial motivation for Murphy's debt to ESB to be found nondischargeable, since he is jointly and severally liable on the note. Accordingly, for him to testify that this conversation occurred after the May 2007 extension is all the more believable, since it is against his own pecuniary interest to testify in a fashion that would tend to render the debt dischargeable.

[14]*Johnson v. Riebesell (In re Riebesell)*, ___ F.3d ___, 2009 WL 3448743, *4 (10th Cir. 2009) (quoting *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)).

[15]*Id.* at *6 (citing *Field v. Mans*, 516 U.S. 59, 74-75 (1995)).

establish that it justifiably relied upon that misrepresentation, at the point in time it was more likely than not made, to grant the extension.

First, Davied never testified that the misrepresentation is what caused or even contributed to his, and thus the bank's, decision to grant the extension of time. In fact, he testified that the first time Murphy admitted to him that they were "short" on collateral was at or near the August 2007 inspection. Accordingly, the Court does not believe that the Bank could have relied on this misrepresentation in extending the maturity date of the loan (or in any prior renewals of the loan). Furthermore, Davied testified that the reason he extended the note (as opposed to renewing it, as had been the course of business over the life of the loan) was because Murphy told him that he had begun working an off-the farm job at the local coop around the time the next regular note renewal, and inspection, were anticipated. Murphy called to request they delay the cattle inspection so that Murphy would not have to take off work at that point.

Davied testified that because 2PM had not previously requested such an extension, he granted the request. Davied also noted that Murphy made extra money selling fescue, and that it was fescue season, so he wanted to accommodate Murphy's request for additional time to do the inspection so he wouldn't miss this opportunity to make income from his coop work and his fescue sales. Again, at no time did Davied testify that he granted the extension based on any representation, or misrepresentation, by Murphy as to the number of cattle currently under his control that served as collateral for ESB's note.

In addition to the denial by the bank officer that he was ever told the operation was short of cattle (until the very end), and the lack of any evidence that the misrepresentation formed any part of ESB's decision to grant the extension on May 4, 2007 (or any other time), reasonable inferences

drawn from the evidence similarly corroborate that this misrepresentation was not the basis for that extension. On October 23, 2006, Davied and Murphy estimated there were 293 head of 2PM cattle with a total estimated value of $166,737.50. That was just barely sufficient to secure the $165,000.00 note to 2PM. In addition, ESB estimated at that time, based on that joint inspection, that there were sufficient additional cattle to satisfy Murphy's personal note with the bank.

Conversely, the misrepresentation Murphy made to ESB either in connection with the May 4, 2007 extension or, even more likely, closer to the last inspection done in August 2007, was that there were now only 100 head of cattle to secure the 2PM note. Obviously, this number would have rendered the loan significantly under secured. The Court finds that it is more likely than not that Davied, acting on behalf of ESB, did not rely upon Murphy's misrepresentation in deciding on May 4, 2007 to extend the due date of the loan for 90 days.

The Court also gathered from the evidence that the fact ESB granted only a 90-day extension for payment, rather than a six-month renewal of the note as had previously been the course of business for several years, at least suggests that Davied likely understood there was a problem with this note. This is corroborated by Murphy's testimony that he disclosed to Davied that he was "short" on cattle when he requested the extension. It is further corroborated by Pyle's testimony that he began asking Davied, himself, a year or two prior to the note's default, whether Davied believed there were sufficient cattle to secure the loan. In addition, if it took nearly 300 head to collateralize the 2PM note in October of 2006, there is no way ESB was even close to fully secured if there were only 100 head in May of 2007—which Davied would have had to appreciate if he was really told this.

Further, the Court finds it unlikely that ESB would have taken a different position regarding the extension had Murphy been forthcoming with the fact that there were actually only 60 head, rather than the 100 head he represented. Part of the Court's conclusion is based on the fact that Murphy's grandfather had been a long-time customer of ESB, that Davied had known Murphy's grandfather "his whole life," because 2PM paid the required interest of $7,284.77 at the time of the extension, and finally, because ESB had both Murphy's grandfather's and Mr. Pyle's personal liability to ensure the collectability of the note in addition to the cattle, if all else failed.

Based upon all of the facts and circumstances surrounding the last "renewal or extension of credit" in this case, which occurred May 4, 2007, the Court finds that ESB, acting through Davied, did not rely, let alone justifiably rely, upon Murphy's alleged misrepresentation that 40 more head existed than actually did exist at that point in deciding to extend the maturity date on the loan, even if this misrepresentation occurred at this point. The best case scenario for ESB, and its claim in this case, is if the misrepresentation occurred before the last extension. Even if the representation did occur at this time, which the Court doubts, the Court finds that ESB had to know its 2PM loan was significantly unsecured when it nevertheless elected to extend the due date 90 days. The fact Murphy told ESB 100 head existed, when there were really only 60, would not have justifiably altered its course of action.

Alternatively, had Murphy informed Davied there were 250 or 275 cattle present in May 4, 2007 when in fact there were only 60, the Court's opinion might well be different. However, the Court does not believe that ESB carried its burden of demonstrating it was willing to grant a 90-day extension based upon the representation that there were 100 head of cattle, but would not have

granted that extension had it been informed there were actually only 60 head of cattle present, since either amount would have left ESB vastly under secured.

## IV. CONCLUSION

Based upon a complete re-examination of the evidence in this case, the Court finds it made an error about a crucial finding of fact in this case. Frankly, that any misrepresentation was made was troubling, and the Court was reluctant to discharge a debt when a debtor had made any misrepresentation.[16] But that is not the appropriate standard, and the Court should not have been unduly swayed by the fact of that misrepresentation. Defendant has in this case appropriately used the oft-overused, and inappropriately used, motion to reconsider vehicle, and the Court is grateful for the opportunity to correct its error.

The Court agrees with Murphy, after determining that the misrepresentation was in fact made at a completely different time than the Court had originally concluded, that it is much more likely that this misrepresentation actually took place in connection with the May 2007 extension, or later. The Court finds that this misrepresentation was not the basis for ESB's decision, in whole or in part, to grant the 90-day extension on May 4, 2007 (or any earlier renewals). ESB failed to demonstrate

---

[16]This is true even though the Court was left with the overall impression that Defendant Murphy was a hard-working, honest, but unsophisticated, borrower, as set forth in the original opinion:

> "The Court finds that because of the economic climate, including the financial set back to the beef industry precipitated by the mad cow disease from which 2PM never recovered, coupled with increasing feed prices, Murphy got behind on cattle early on and just kept plugging away, trying to find ways to make this venture profitable. He tried different ways of conducting the cattle operation, including a venture he ultimately conducted with his in-laws using the financing available through a specific feed yard that ESB refused to let him use for its collateral. He worked a second job, in the evenings, while trying to hold on and earn a profit. His grandfather was jointly responsible for this debt, and it was clear that he tried everything he could to spare his grandfather from losing his money. At trial, it was clear that Murphy did everything he knew how (including the misrepresentation noted above) to try and keep this cattle venture afloat.
>
> Obviously his efforts failed, but there was no evidence of a malicious intent behind any of his actions. There was no evidence presented to show that Murphy acted in a manner that he knew was certain to cause financial harm to ESB."

that it relied on this statement in any fashion when deciding to grant the extension, let alone that it would have been justified in so relying. Therefore, ESB cannot claim that the debt in question is nondischargeable under § 523(a)(2)(A) based upon that alleged misrepresentation.

The only other bases ESB asserted for finding that the debt is non-dischargeable, including, in part, that Murphy was co-mingling the 2PM cattle with his own cattle and failed to properly identify which cattle were collateral for the 2PM note, that he was selling the cattle at locations that were not authorized by ESB, and that he failed to apply the proceeds from the sale of the 2PM cattle to the note at ESB, were previously considered by the Court and rejected.

Specifically, the Court found that ESB's claim that Murphy was co-mingling the cattle and failed to correctly identify which cattle were property of 2PM during the cattle inspections was not sufficiently proven to establish a non-dischargeability claim under § 523(a)(2)(A). The Court found Murphy's testimony highly credible when he explained that he and Davied would count the total number of cattle under Murphy's control, including both his personal cattle and those belonging to 2PM, and then apportion those cattle among both the personal notes and the 2PM note to see if there were sufficient cattle. At a minimum, ESB failed to establish by a preponderance of the evidence that Murphy had misled Davied or that Murphy's testimony concerning the way the cattle inspections were handled was false.

It seemed entirely possible, if not likely, that Davied and Murphy jointly estimated the total number of cattle under Murphy's control and then determined whether there were sufficient cattle to collateralize both the 2PM note and Murphy's personal notes. As long as there were sufficient cattle to secure the bank on both notes, ESB did not care that the cattle were co-mingled, and did not concern itself with which specific cattle belonged to 2PM.

Based upon the Court's prior decision, and this decision that corrects an incorrect factual finding, the Court finds that ESB failed to establish that the debt owed by Murphy to ESB is non-dischargeable in Murphy's bankruptcy case.

**IT IS, THEREFORE, BY THE COURT ORDERED** that Defendant Joseph Dean Murphy's Motion for Reconsideration is granted.

**IT IS FURTHER ORDERED** that the debt owed by Murphy to ESB in connection with the 2PM cattle operation is dischargeable in Murphy's bankruptcy case, and that judgment is granted in his favor.

# # #